PROYOSTY, J.
The sawmill building of the defendant company, which some of the witnesses call a “shed,” because it has but one floor and is open on all sides, is 140 feet long by 70 wide, and is built on sloping ground, 1 foot above the ground at one end and 7 at the other. Under it, lengthwise with it, and about 20 feet from one of the sides, is the main power shaft, 110 feet long, from which the machines overhead, of which there are eight, get their motive power. These machines are directly above, and on a line with, the main shaft, and are connected with it by belts that run vertically down through the floor and revolve on pulleys. The belt of the particular machine with which we are concerned in this case was 4 inches wide, and the pulley upon the main shaft upon which it ran was 8 inches wide and 30 in diameter. The machine was a cut-off saw, and the husband of the plaintiff, John Simon, a colored man 35 years old, and another workman, named Meziere, were using it for cutting flooring into shorter lengths. The work was heavier than the machine was designed for, and the belt would, as a consequence, frequently slip off the pulley on the main shaft under the floor, and Simon would have to go under the building and slip it on again. For doing this, the workman stands facing the pulley, and stoops, and takes hold of the hanging belt with one hand, while with the other he pushes it against the pulley, when it is drawn on by the motion of the pulley. Sometimes, or perhaps generally, a piece of wood is used, so that the rubbing of the belt, while in process of going on, may be against this piece of wood, and not against the hand. The belt being small and hanging perpendicularly, very little or hardly any exertion is required for this operation, and a piece of stick about a foot long and half an inch in diameter will answer the purpose. To extend to the far end of the power shaft the standing room under the building, a trench 5 to 6 feet wide and increasing in depth as the ground rises was dug alongside of the shaft, and the earth out of this trench was *1074 deposited on one side of the trench. The shaft is 3 feet above the bottom of this trench. At the particular pulley upon which Simon went down to replace the belt, this trench is 1 foot deep, and the earth from out of it makes a ridge 1% feet high on that side of it back of the workman as he stands in it facing the pulley. It was 10 o’clock in the morning. Simon and Meziere had begun on the afternoon of the preceding day to cut this flooring with this machine, and had resumed their work that morning. Meziere, seeing that Simon was not returning (although he had completed his work of replacing the belt, since the machine had resumed its motion), went down to find out what was the matter. He found him half sitting, half reclining, on the embankment on the side of the trench, his head tilted back over the crest of the ridge on the side of the trench, and his feet in the trench, as if he had fallen back from the pulley. He was dead. His hat was lying right at, or partly on, or under, his head. His clothes were not torn. There were no scratches or bruises on his person, and no blood came from his eyes, ears, nose, or mouth.
The plaintiff accounts for his death on the theory that he was struck by the fast-revolving pulley, or by some piece of wood he must have been using for putting on the belt, and his neck broken, and lays the responsibility upon the defendant company for not having provided a safer place and safer appliances for its workmen to do their work: that it was dark under this building, and the space or elbow room scant and contracted, by reason of the numerous brick pillars, and wooden braces, and machinery — in fact, a veritable death trap; that the replacing of the belt with the hand, or with a piece of wood, while in motion, is an antiquated and dangerous method, the modern and safe mode being by means of a countershaft and loose pulley and lever.
We do not find that the place or the appliance was unsafe. There was all the elbow and standing room and light that could be needed for an operation so simple; and the replacing of belts with the hand is not shown to be an antiquated method, or to be dangerous, except in the sense in which all fast-moving machinery is dangerous. All the workmen, indiscriminately, who worked at the machines, replaced the belts that came off; and, although they have been doing it for over three years, ever since this mill was constructed, and each one, probably several times a day, since these belts are constantly coming off (Simon himself had, on the morning of his death and on the preceding afternoon, replaced this same belt 15 or 20 times), no accident has ever happened, unless the present case offers the example of one, and whether it does or not is yet to be proved. Of the two experts put by plaintiff upon the stand to condemn this method of replacing the belts and to approve the suggested method of countershaft, loose pulley, and lever, one does so most unqualifiedly, but is evidently not a man very guarded in giving his opinion. The other expresses the opinion that in defendant’s mill, constructed as it is, the one pulley directly below the other, with only about six feet between them, the suggested method would have been impracticable and the more dangerous of the two. And that view is confirmed by two employés of defendant, testifying as experts, who produce the impression of speaking with candor and from competent knowledge.
And if it were otherwise, if the suggested method were the safer, “the master is not required to furnish the newest, safest, and best machinery, appliances, and places for work; but his obligation is met when he furnishes such as are reasonably safe and suitable for the purpose had in view.” 26 Cyc. 1107. One of the same two employés of defendant (both of them mill men) testi *1076 fies that, though he has been working in sawmills for more than 15 years, he knows of none equipped with the means of shifting belts suggested by plaintiff as the safer, and that not one of the six mills of the defendant company is so equipped. The other employs practically corroborates this. There is nothing to show that other sawmills are not equipped precisely as defendant’s is, except that one of plaintiff’s experts says that, generally speaking, that mode is safer, and that his own cotton gin is so equipped, and that the other expert of plaintiff, without specifying any particular sawmill that is so equipped, testifies, in general terms, that all modern machinery is so equipped — in fact, that the law requires it.
The defendant company was therefore not negligent, and is in consequence not liable, even if the dead man came by his death in the manner suggested; and even if, in case he did, he would not, under the circumstances, have to be held to have assumed the risks that the situation presented, he having been an experienced workman, who had been .working at this mill off and on for over three years, and presumably doing this same kind of work a great part of the time.
But the fact that the machinery caused Simon’s death is far from being established. It is easily conceivable how his hand or his clothes could have got caught in the fast-revolving pulley' and belt; but nothing of that kind happened. How his head could have got caught in it, unless he deliberately put it in, or stumbled and fell against the machinery (in either of which cases there would, of course, be no responsibility on the part of the defendant company), it is not easy to conceive. The theory of the piece of wood offers a possible solution, but one extremely improbable, and all the more so from the fact that no such piece of wood was found near, or about, the body, and that a piece of wood so small as that usually made use of for the purpose could hardly have broken a man’s neck, or, at any rate, could hardly have thrown the man back to the position in which the body was found, and especially done so without leaving any marks. The improbability is further increased by the fact that whatever did occur occurred only after all had been done that was necessary to be done for putting on the belt.
Moreover, the first step in the process of establishing that theory would have to be to make certain that the man’s neck was broken; and this has not been done. With a view so to do, a post mortem examination was made. The corpse was placed face downward with a block of wood under its chest and its forehead touching the table. A cut was made around the back of the head from ear to ear, level with the upper part of the ears. Then a cut was made on each side down to the shoulders. The flesh inside of these three cuts was then turned back on the shoulders, uncovering the bones of the back part of the neck. Four physicians were present. Two found that the neck was broken, and two that it was not. The first two base their conclusion upon the fact that between the back part of the two top vertebrae of the neck — those at the base of the skull, the atlas and axis — there was a separation wide enough to admit a finger. The other two doctors thought this opening between the two bones was fully accounted for by the position of the corpse, its head bent down to the table; especially that the sustaining muscles and ligaments had been stripped off. Another physician seemed to think the latter theory quite tenable. Another circumstance militating against the first theory is that the atlas and the axis are the most securely connected of all the articulations of the neck, and the least liable to get out of alignment, they being provided with a pivot joint, whereas the other neck vertebrae have simply articulating surfaces. The *1078 neck would not likely have snapped at its strongest point. The absence of external marks, and of blood from eyes, ears, nose, and mouth, is also a circumstance of much significance.
The trial judge found against plaintiff.
Judgment affirmed.